**Antwan BUCHANAN, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 07–CM–393.**

District of Columbia Court of Appeals.

Argued May 12, 2010.

Decided Dec. 8, 2011.

---

Jessica Brand, Public Defender Service, with whom James Klein, Public Defender Service, was on the brief, for appellant.

Bridget Fitzpatrick, Assistant United States Attorney, with whom Channing D. Phillips, Acting United States Attorney at the time the brief was filed, Roy W.

McLeese III, and Sean Tonolli, Assistant United States Attorneys, were on the brief, for appellee.

Before OBERLY, Associate Judge, RUIZ,* Associate Judge, Retired, and FARRELL, Senior Judge.

PER CURIAM:

Following a bench trial, appellant was found guilty of simple assault. Contrary to his first argument on appeal, the evidence was sufficient to support a finding beyond a reasonable doubt that he assaulted the victim, Lieutenant Wilkins of the Metropolitan Police Department. Appellant also contends, however, that the judge as trier of fact made no unambiguous finding that he had the intent, required for assault by our decisions, to use force against the officer. Because we agree that the judge's oral finding of guilt leaves unclear whether appellant indeed had the requisite intent—rather than having struck the officer accidentally—we must remand the case for clarification by the judge and any supplemental findings as to intent which the judge deems necessary.

Evidence showed that as Lieutenant Wilkins tried to arrest appellant for a drug sale and place handcuffs on him, appellant resisted the arrest. Depending on which testimony was credited, appellant did so either by pushing, elbowing, and intentionally striking the officer or, instead, by "balling himself up," "rolling onto his stomach," and "flailing his elbows" to avoid the handcuffing. The prosecution argued that appellant was guilty under either scenario so long as he intended the act of flailing his arms, even if he did not mean to strike the officer. Appellant, by contrast, citing this court's decision in *Williams v. United States*, 887 A.2d 1000

---

* Judge Ruiz was an Associate Judge of the court at the time of argument. Her status

changed to Associate Judge, Retired, on September 1, 2011.

(D.C.2005), argued that he must at least have intended to use physical force against the officer and that if his contact with the victim was only the "accidental[ ]" effect, *id.* at 1003, of his keeping his arms apart to prevent the handcuffing, he lacked the mens rea for assault.[1]

Our examination of the trial judge's brief explanation for finding appellant guilty leaves us uncertain whether the judge resolved this disagreement. Appellant is correct that in *Williams* (also a bench trial) we rejected as a basis for conviction of assault a finding merely that the defendant had thrown a shoe in the direction of the victim—"intend[ing] to throw the shoe," *id.* at 1002—without a finding also that he "meant to throw it at the complaining witness." *Id.* at 1003. We therefore remanded the case for the judge to make an express finding whether the government had proven beyond a reasonable doubt that the defendant had "thr[own] the shoe with the intent to hit [the victim] with it." *Id.* at 1004. In this case, similarly, it is not clear whether the judge deemed sufficient that appellant had accidentally made contact with the officer while squirming and attempting to keep his arms apart ("He was trying to move his arms apart.") and avoid the cuffing, or instead found that appellant had intended to use force against the officer, if only to avoid the cuffing and not (as the judge said at another point) "trying to injure [him]." The judge's ultimate and terse explanation for finding appellant guilty—"[The officer] was struck by the defendant. The defendant was flailing his elbows around trying to keep them apart so he wouldn't be cuffed"—leaves too much uncertainty whether he applied an understanding of

intent consistent with our decision in *Williams.*

Accordingly, as in *Williams,* we remand the case for the trial judge to clarify the intent he found exhibited by appellant's actions, including any additional findings the judge believes necessary. If the judge finds that appellant, in struggling and flailing his arms about, intended to use force against the officer, then appellant's "conviction and sentence may stand." *Williams,* 887 A.2d at 1004. But if the judge finds that the striking of the victim was the accidental result of appellant's merely trying to keep his arms apart and make his body unamenable to handcuffing, then he "must find [appellant] not guilty." *Id.*

*So ordered.*

RUIZ, Associate Judge, Retired, concurring:

I concur in remanding the case to the trial court for further consideration and fact-finding. As in (*Antwan* ) *Williams v. United States,* 887 A.2d 1000 (D.C.2005), the record is such as to leave us in doubt as to whether—as the government has argued in the trial court and in this court—all that the trial court needed to determine for conviction for simple assault is that appellant "intended to do the act that constituted the assault." In this case, that would have been appellant's efforts to disengage his arms from the officer's repeated attempts to handcuff him, by moving his arms toward the front of his body, keeping them rigidly extended and rolling into a ball to prevent the officer from grasping his arms. Unlike in *Williams,* however, where the question that had been

---

1. On appeal appellant argues likewise that "[a]n accidental touching will not suffice to convict the defendant of simple assault" because, "[a]s the Supreme Court has stated, it is not natural 'to say that a person actively employs physical force against another person by accident.' " (Br. for App. at 16) (quoting *Leocal v. Ashcroft,* 543 U.S. 1, 9, 125 S.Ct. 377, 160 L.Ed.2d 271 (2004)).

left unaddressed was whether the detained suspect had thrown the shoe intending to hit the officer (which would have sufficed for assault) or merely flung the shoe in frustration without directing it at the officer (which would not), *see id.* at 1002–03, this case presents a more nuanced question because the physical proximity between the officer, who was touching appellant in an attempt to handcuff him, and appellant, who was resisting the officer's efforts, made physical contact inevitable. In this context, the factual scenario is not as clearly drawn as in *Williams,* where there either was, or was not, an intention to hit the officer. This appeal therefore raises the question, that the judge will have to address on remand, whether the circumstances here, under which appellant undisputedly made contact with the officer, support that he had the *mens rea* for simple assault. This is an issue that our cases have not clearly confronted and, it can fairly be said, have at times muddled. The purpose of this concurrence is to review the cases and, by distilling the essential holdings from what is dicta, set out—in hopefully clearer terms—the *mens rea* element of simple assault.

## I.

To begin, I add a few facts to complete the description of the encounter between appellant and Lieutenant Wilkins—all of which were presented through the testimony of Lieutenant Wilkins and the officers who came to assist him in arresting appellant. I also add the arguments made by counsel and the trial court's reasoning.

On the afternoon of June 3, 2006, Metropolitan Police Department (MPD) Officer Michael Newton observed what he believed to be a drug transaction between a seller, later identified as appellant, and two buyers on the 1600 block of E Street, N.E. After stopping the buyers, who were found to have marijuana, Officer Newton directed other MPD officers to arrest appellant,

who was still nearby. MPD Lieutenant Ronald Wilkins, who was undercover, saw appellant entering an apartment building and followed him into the building. Once inside, Wilkins saw appellant approach the open door of an apartment in the hallway. As appellant tried to enter the apartment, Lieutenant Wilkins grabbed him by the shirt. Appellant "started twisting" and managed to pull himself into the apartment. Wilkins called for back-up assistance.

Lieutenant Wilkins held fast to appellant's shirt and entered the apartment with him. Appellant fell onto a couch by the door. Wilkins identified himself as a police officer several times and tried to place handcuffs on appellant, but appellant "balled himself up and was attempting to roll ... on[to] his stomach." Wilkins and appellant then began to "tussle[ ] back and forth." As Wilkins repeatedly tried to maneuver appellant's wrists into a position to place the handcuffs, appellant continued to avoid the handcuffing. ("The more I would grab a hold of him to try to maneuver his hands around the more he would roll.") Wilkins described the incident as "a lot of pushing, back and forth and elbows being thrown"; he also stated that as he attempted to get a hold of appellant's arm, appellant would "swing his arm back and hit [him]."

MPD Officers Dwayne Johnson and Zachary Melby responded to Lieutenant Wilkins's call for back-up. Together, the three officers succeeded in placing appellant in handcuffs. The officers described that appellant would:

pull[ ] his arms away and try to ball up which is common for someone who doesn't want to surrender his arms and get handcuffed. It's just harder for us. If they lock their arms under their body then you have to kind of physically pull their arms away to get them placed in

handcuffs. You know, a lot of pushing back and forth and elbows being thrown, stuff like that.

Appellant "push[ed] and elbow[ed]" the officers several times, striking Wilkins's torso "a couple [of] times." As the "wrestling match" continued, Wilkins noticed a folding lock-blade knife in appellant's right front pants pocket. Wilkins "had a hold of [appellant's] right hand and with one of [his] hands grabbed the knife and threw it on the ground." The officers were soon able to restrain appellant and place him in handcuffs. The officers then searched him and recovered four small bags of cocaine, four pills containing amphetamines, and $136 in cash.

On cross-examination, defense counsel asked Lieutenant Wilkins whether he believed appellant had intended to strike him. Wilkins responded:

> I don't think his intentions were specifically to strike me in the torso area with his arms. It was my opinion that he was intentionally trying to roll his body and lock his arms to prevent being handcuffed which supported the APO charge. I don't think he specifically or had the specific intent to strike me in the chest or the body area with his elbows as he was trying to break my grip free. That's why he wasn't charged with that as a specific intent.

At the close of the government's case, defense counsel moved for a judgment of acquittal as to the charge of assault, arguing that the government had failed to prove the *mens rea* element of assault. In support of the motion, counsel cited Lieutenant Wilkins's testimony regarding his belief that appellant had no intention of striking him. Defense counsel also underlined the fact that appellant had been arrested for the crime of assaulting a police officer (APO) but was actually prosecuted for simple assault and that, unlike APO, simple assault requires a showing of actual intent to injure the officer, beyond merely resisting or impeding arrest. The trial court denied the motion, explaining:

> When it comes to the simple assault ... you're quite right to argue, I think, what Wilkins says, that he did not believe that the defendant was trying to strike him for the sake of striking him. He wanted to get loose, or he didn't want to have the cuffs put on him. But, nonetheless, that, while it's a slightly different motive, or a slightly different motivation, [it] is the officer's assessment of why he did it; why he struck at him with his elbows. He was trying to move his arms apart. So ... I'm not quite persuaded, at this stage of things anyhow, that this was inadvertent, you might say; it was an accident; it was a mistake; it was not intention[al].
>
> I think it was intentional in the sense that it was done to get ... [Lieutenant Wilkins] away from him. And the cuffs away. He wasn't trying to exact revenge on Wilkins, or he wasn't trying to threaten Wilkins. He wasn't trying to injure Wilkins for some other reason. He wanted to stop him from cuffing him and I think it's probably sufficient here. Because he—I think, the evidence would—that this was done purposefully.... [H]e knew what they were doing and they were there to arrest him, and he wanted to get away. He didn't want to be arrested; he didn't want to be cuffed. So even though he had that, rather than—... I'm gonna' frighten you; I'm gonna' punish you; I'm gonna' hurt you; I'm gonna' threaten you. Even though he didn't do it for those reasons exactly, I still think it suffices for simple assault.

After the close of all the evidence, defense counsel moved for a judgment of acquittal a second time, once again alleging that the government had failed to establish

that he acted "with the intention to injure." The trial court denied this motion as well, reasoning that:

> I think that the testimony about the motive doesn't ... undo the Government's evidence about the attempt or effort with force or violence to injure another. He wanted to do what he did, you know. He didn't do it simply for the sake of injuring him, just out of sheer malice or malevolence, he did it to stop him from handcuffing him.

During closing argument, the prosecutor argued that appellant had assaulted the officer because "Lieutenant Wilkins had to wrestle with [appellant] in order to get him under arrest...." In his rebuttal argument, the prosecutor clarified that "[appellant] was attempting to evade arrest and he was using his arms and his body in order to do so. That was intentional and in the process he hit Lieutenant Wilkins. Whatever Lieutenant Wilkins believes the defendant's specific intent to be is neither here nor there. What matters is his actions. And, at the time, it's clear that they were intentional and they need harm, or attempt to harm, Lieutenant Wilkins."

After the parties delivered their closing arguments, the trial court found appellant guilty of simple assault and possession of cocaine and amphetamine. Finding the testimony of the police officers "fundamentally credible," the trial court explained:

> I convict [the defendant] of assault because, even though [Lieutenant Wilkins] provides a motive of what, in his view, was going on, still it constitutes an assault. It may have been an assault for the reason the officer said, rather than some other reason, urged on [me] by the U.S. Attorney or by other witnesses, but still I think it was an assault. He was struck by the defendant. The defendant was flailing his elbows around trying to

keep them apart so he wouldn't be cuffed. Now that's the occasion for the assault on Lieutenant Wilkins.

Appellant appealed his conviction for assault.[2]

## II.

Appellant maintains that to convict him of assault, the fact of a blow to the officer's torso was not enough, and that the government was required to prove and the trial court had to find beyond a reasonable doubt, that he intended to "cause injury" or "use physical violence" directed against Lieutenant Wilkins. He cites *(Antwan) Williams*, 887 A.2d at 1003, for the proposition that "in an 'attempted-battery' assault case, the prosecution must prove, *inter alia*, an intention ... of using actual violence against the person. Indeed, the *intentional* infliction of bodily injury is the essence of such an assault." (internal quotations and citations omitted). Appellant argues that the officers' testimony does not permit a finding that appellant acted with such intent and that, in fact, Lieutenant Wilkins's testimony is to the contrary. Thus, argues appellant, his conviction for simple assault should be reversed because the trial court erroneously determined (when it denied the motions for judgment of acquittal) that appellant could be found guilty of assault even if his contact with Wilkins was solely the result of his efforts to avoid being handcuffed and was not intended to threaten or injure the officer. In the alternative, even if the government's evidence were sufficient, appellant asserts that because in announcing the verdict the judge eschewed a finding of intent, we should remand the case so the trial court can make a finding on that issue.

The government disagrees, citing a number of cases in which we have stated

---

**2.** Appellant does not challenge the drug-related convictions.

that there are "three essential elements of the crime of assault: First, there must be an act on the part of the defendant; mere words do not constitute an assault. . . . Secondly, at the time the defendant commits the act, the defendant must have the apparent present ability to injure the victim. Finally, at the time the act is committed, *the defendant must have the intent to perform the acts which constitute the assault.*" *Dunn v. United States,* 976 A.2d 217, 219–20 (D.C.2009) (emphasis added) (quoting *Ray v. United States,* 575 A.2d 1196, 1198 (D.C.1990)). Thus, the government argues, the only "intent" needed to sustain a conviction for assault is the intent to do the assaultive act itself, and "there need be no subjective intention to bring about an injury." *Anthony v. United States,* 361 A.2d 202, 206 n. 5 (D.C. 1976). In the alternative, the government argues that the trial court's finding satisfied appellant's more stringent requirement. Both questions—whether the evidence was sufficient to sustain a conviction of assault and what determination must be made by the trial court (or jury) to come to a determination of guilt—depend upon the exact contours of our law of simple assault. As I now discuss, our opinions have not been crystal-clear on the issue.

## A.

D.C.Code § 22–404(a)(1) (2001) criminalizes simple assault, penalizing anyone who "unlawfully assaults or threatens another in a menacing manner." It has long been recognized that "assault as contemplated by the statute is common law assault." *Beausoliel v. United States,* 71 App.D.C. 111, 114, 107 F.2d 292, 295 (1939) (internal quotation omitted). The common law of criminal assault in this jurisdiction can be traced back to *Patterson v. Pillans,* 43 App.D.C. 505 (1915), where one of our predecessor courts defined *civil* assault as "an attempt with force or violence to do a corporal injury to another[,] and may con-

sist of any act tending to such corporal injury, accompanied with such circumstances as denote at the time an intention, coupled with the present ability, of using actual violence against the person." *Id.* at 506–07 (quoting *Hays v. People,* 1 Hill 351, 352 (N.Y.Sup.Ct.1841)). This standard has been incorporated into our law of criminal assault for many years. *See, e.g., Beausoliel,* 107 F.2d at 295 n. 14 (defining criminal assault with reference to *Patterson* ); *Guarro v. United States,* 99 U.S.App.D.C. 97, 99, 237 F.2d 578, 580 (1956) (same); *Anthony,* 361 A.2d at 204 (same). This theory of assault is commonly referred to as "attempted-battery" assault.

Following *Patterson,* "[t]he concept of criminal assault . . . expanded in this jurisdiction, as in most jurisdictions, to include not only the common law attempted-battery theory but also the intent-to-frighten theory adopting certain aspects from the civil law of torts." *Parks v. United States,* 627 A.2d 1, 4 (D.C.1993) (footnote omitted). We recognized for the first time in 1976 that:

> [C]ertain aspects of the concepts of a criminal assault and the tort of assault have merged, enlarging the criminal concept to encompass such conduct as could induce in the victim a well-founded apprehension of peril. Under this expanded concept of common law assault, a lack of actual ability to inflict the harm threatened is largely irrelevant, since the behavior of the assailant still might be such as would generate fright in the intended victim. . . . It is not the secret intent of the assaulting party, nor the undisclosed fact of his ability or inability to commit a battery, that is material; but what his conduct and the attending circumstances denote at the time to the party assaulted.

*Anthony,* 361 A.2d at 204–05 (citations, quotations and footnotes omitted). Under

this "intent-to-frighten" theory of assault, "the crucial inquiry remains whether the assailant acted in such a manner as would under the circumstances portend an immediate threat of danger to a person of reasonable sensibility." *Id.* at 206.

Despite the different origins of these two types of assault,[3] we have stated generally that the elements of both are the same. We have arrived at this position by a very circuitous route, beginning with the opinion of the United States Court of Appeals for the District of Columbia Circuit in *Parker v. United States,* 123 U.S.App. D.C. 343, 359 F.2d 1009 (1966). In *Parker,* a defendant had been convicted of assault with a dangerous weapon ("ADW") for a break-in involving the use of a knife. At trial, the defendant introduced evidence to show that he had been heavily intoxicated the night of the assault, but the jury was not instructed that intoxication could serve as a defense to ADW. He was found guilty and he appealed, arguing that an ADW conviction had to be supported by a showing that the actor had "an intent to do serious injury"—an intent that could have been negated by voluntary intoxication. 359 F.2d at 1011.

The District of Columbia Circuit disagreed. It began its analysis by examining the language of the relevant statute, which provided simply that, "Every person convicted of an assault with intent to commit mayhem, or of an assault with a dangerous weapon, shall be sentenced to imprisonment for not more than ten years." D.C.Code § 22–502 (1961). Unlike other statutes that had been interpreted to require intent, the statute proscribing ADW "[did] not include such words as 'willfully' or 'with intent.'" *Parker,* 359 F.2d at 1011.

Therefore, by its plain language, the crime of ADW "[did] not require that the weapon be used with a conscious purpose to inflict injury," and so the court "decline[d] to read this requirement into it." *Id.* at 1012.

The court bolstered this textual analysis with the practical observation that "[t]he potential for serious bodily harm through the reckless use of dangerous weapons is as substantial as it is obvious. Use of such weapons, even when there is no specific intent to employ them to inflict injury, is invariably fraught with the possibility of dangerous consequences." *Id.* Given the inherent dangerousness of the offense, the court feared that "the policies of the statute," *i.e.,* preventing dangerous weapons from being used at all, "would not be served by allowing voluntary intoxication to be asserted as a defense [to ADW]." *Id.* Therefore, the court concluded that "a specific intent to inflict serious injury with the weapon is not necessary" for an ADW conviction, and so "drunkenness [wa]s no defense." *Id.* at 1012.

In a footnote, the court addressed an argument by the government that assault crimes, as a general matter, did not require intent to cause injury. The court noted that "[s]ome jurisdictions avoid this element by presuming an intent to injure from the commission of the act, by presuming an intent to injure from reckless conduct, or by relying on the reasonableness of the apprehensions of the persons assaulted." *Id.* at 1012 n. 4. The court declined to address the issue, but in so doing, stated that "the issue of intoxication aside, it is not claimed here that the elements of an assault are lacking. It seems clear that, *regardless of the definition, vol-*

---

3. We have identified a third kind of common law simple assault, non-violent sexual touching. *See Mungo v. United States,* 772 A.2d 240, 245 (D.C.2001) (citing *In re A.B.,* 556 A.2d 645, 646 (D.C.1989)). "[T]his offense is characterized as an assault because the sexual nature [of the conduct] supplies the element of violence or threat of violence required by § 22–504 [now codified at § 22–404]." *Id.* (internal quotation marks omitted).

*untary intoxication is no defense to simple assault.*" *Id.* at n. 4 (emphasis added) (citing *McGee v. State,* 4 Ala.App. 54, 58 So. 1008 (1912); *State v. Truitt,* 62 A. 790 (Del.Ct.Gen.Sess.1905)). The court's conclusion that intoxication is not a defense to simple assault appears to rest upon the unstated premise that simple assault is a "general intent" crime.[4]

Following *Parker* was *Pino v. United States,* 125 U.S.App.D.C. 225, 370 F.2d 247 (1966) (per curiam), a case that dealt with the crime of APO. Also by way of a footnote, the District of Columbia Circuit refuted an argument by the defendant that his original indictment had been defective for failing to make reference to the intent element of the crime of assault. Citing *Parker,* the *Pino* court stated summarily that "assault is a so-called 'general intent' crime." *Id.* at 248 n. 1 (generally citing *Parker,* 359 F.2d 1009). Subsequently, this court has relied on *Pino* and *Parker* (and their progeny) for the proposition that assault offenses, including simple assault, are "general intent" crimes.[5] And notwithstanding that *Pino* and *Parker* involved ADW and APO, we have many cases stating that "in a prosecution for simple assault, the government must prove, beyond a reasonable doubt, that the defendant made '(1) an attempt, with force

---

**4.** The District of Columbia Circuit's citation to *McGee* is ironic in this regard because that case in fact held that assault is a specific intent crime: Distinguishing between civil and criminal assault, the court held that "[i]n a criminal prosecution for an assault and battery ... the *intent to injure* is one of the essential elements of the offense." *McGee,* 58 So. at 1009. Citing an "exception" to that intent requirement, the *McGee* court held that voluntary intoxication was no defense to assault, even if it would ordinarily negate an essential element of a specific intent crime. *Id.* ("One of the exceptions to the above rule is that, in a criminal prosecution for an assault and battery or an assault, the fact that the defendant was voluntarily drunk at the time and was, on that account, incapable of forming or entertaining an intent to injure is no defense to such prosecution."). The court did not explain the reasoning for this exception, *see id.* ("The reasoning for this rule is so well known that we will not discuss it."), but it is probable that the court had in mind a public policy against excusing the acts of a malfeasant who had chosen to become intoxicated. The *McGee* court also noted another exception to the intent required for criminal assault, where the actor "does an illegal act from which another suffers personal violence, or wantonly does an act which but for the wantonness would be a legal act under conditions as will be dangerous to another and causing personal violence to another." *Id.* at 1009–10.

**5.** *See, e.g., Anthony,* 361 A.2d at 207 n. 5 (simple assault, relying on *Pino* and *Parker*);

*Sousa v. United States,* 400 A.2d 1036, 1044 (D.C.1979) (same); *Williamson v. United States,* 445 A.2d 975, 978 (D.C.1982) (ADW, relying on *Parker*); *Carter v. United States,* 531 A.2d 956, 960 (1987) (APO, relying on *Pino*); *In re A.B.,* 556 A.2d 645, 647 (D.C. 1989) (simple assault, relying on *Parker* and *Pino*); *Smith v. United States,* 593 A.2d 205, 206–07 (D.C.1991) (ADW, relying on *Williamson, Anthony,* and *Pino*); *Moore v. United States,* 599 A.2d 1381, 1383 (D.C.1991) (attempted-battery assault, relying on *Williamson*); *Ruffin v. United States,* 642 A.2d 1288, 1295 (D.C.1994) (ADW, relying on *Smith* and *Williamson*); *Davis v. United States,* 712 A.2d 482, 486 n. 5 (1998) (simple assault, relying on *Smith*); *Gathy v. United States,* 754 A.2d 912, 919 (D.C.2000) (ADW, relying on *Williamson*); *(Steven) McCoy v. United States,* 781 A.2d 765, 768 (D.C.2001) (ADW, relying on *Gathy*); *Lee v. United States,* 831 A.2d 378, 380 (D.C.2003) (simple assault, relying on *Anthony*); *Bradley v. United States,* 856 A.2d 1157, 1161 (D.C.2004) (simple assault, relying on *Smith*); *Stroman v. United States,* 878 A.2d 1241, 1245 (D.C.2005) (simple assault, relying on *Smith* and *Robinson*); *(Wesley) Williams v. United States,* 881 A.2d 557, 566 (D.C.2005) (ADW, relying on *Gathy*); *Frye v. U.S.,* 926 A.2d 1085, 1096 (D.C.2005) (ADW, relying on *Gathy* and *Williamson*); *(Edward) McCoy v. United States,* 890 A.2d 204, 214 n. 27 (D.C.2006) (ADW, relying on *Frye*); *Spencer v. United States,* 991 A.2d 1185, 1192 (D.C.2010) (ADW, relying on *Williamson*).

or violence, to injure another; (2) [with] the apparent present ability to effect the injury; and (3) [with] *the intent to do the act, constituting the assault.*'" E.g., Stroman, 878 A.2d at 1244–45 (quoting *Macklin v. United States*, 733 A.2d 962, 964 (D.C.1999)) (emphasis added); *see also Williamson*, 445 A.2d at 978 ("The [assaultive] act does not have to result in injury; it can be either an actual attempt, with force or violence, to injure another, or a menacing threat, which may or may not be accompanied by a specific intent to injure, on the part of the defendant." (internal citation omitted)). The government's proposition that the only intent required is the intent to do the act itself is consistent with the proposition that simple assault is a general intent crime. *See Smith*, 593 A.2d at 207 ("The requisite scienter for violation of the [assault] statute does not change merely because the perpetrator makes an effort to do physical injury on one hand and an effort to frighten the victim on the other.... [T]he offense of assault, whether the 'attempted-battery' type or the 'intent-to-frighten' type, remains a general intent crime which may be proved by a showing that the defendant intended to do the acts which constitute the assault.")

## B.

At the same time that we have labeled assault a general intent crime, however, we have also articulated additional showings of intent which would seem to go above and beyond the ordinary conception of general intent merely to do the act constituting the assault. Recalling the distinction between attempted-battery assault and intent-to-frighten assault, we have stated:

> The major difference between [the two types of assault] is in the nature of the intent that must be proven. Attempted-battery assault requires proof of an attempt to cause a physical injury, which "may consist of any act tending to such corporal injury, accompanied with such circumstances as denote at the time *an intention,* coupled with the present ability, *of using actual violence against the person.*" Intent-to-frighten assault, on the other hand, requires proof that the defendant *intended either to cause injury or to create apprehension in the victim* by engaging in some threatening conduct; an actual battery need not be attempted.

*Robinson v. U.S.*, 506 A.2d 572, 574 (D.C. 1986) (emphasis added) (quoting *Patterson*, 43 App.D.C. at 506–07).

We put this requirement into practice in *Parks*, 627 A.2d 1 (D.C.1993), a case involving both theories of assault. There, a suspect had been pulled over in his vehicle during a traffic stop. Realizing that he might be arrested, the suspect restarted the car, retrieved a gun from the floor of the vehicle, and prepared to drive away. A second officer, whom the suspect could not see, came along the passenger-side of the vehicle and stopped him. The suspect (now defendant) was tried and convicted for assaulting a police officer with a dangerous weapon (APODW), among other crimes. 627 A.2d at 3–4.

At his trial, after the presentation of the evidence, the defendant made a motion for judgment of acquittal as to the APODW charge, which the trial court denied. In denying the motion the court found that "a reasonable juror could conclude beyond a reasonable doubt that the defendant inten[ded] either to cause injury or to create apprehension in [the officer], by bringing the pistol or weapon up from where it was apparently stowed." *Id.* at 6. On appeal, the conviction was challenged on the ground that the evidence did not support the conclusion that the defendant's actions were of "the type that would demonstrate an inten[t] to cause apprehension or a menacing threat" to the officer. *Id.*

We found that the trial court's findings supported the defendant's convictions under either theory of assault. We noted that although in all simple assault cases, a required element is that "the defendant must have [had] the intent to perform the act which constitutes the assault," *id.* at 5, "[t]he major distinction between the two theories is in the nature of the intent element that must be proven." *Id.* Further explicating the difference between the two theories, we said, "[o]ur attention is focused 'upon the menacing conduct of the accused and his *purposeful design* either to engender fear in or do violence to his victim.' " *Id.* (quoting *Sousa*, 400 A.2d at 1044) (emphasis added). Applying these requirements, we upheld the conviction under an intent-to-frighten theory because the evidence supported the conclusion that "[the defendant] intended to use the pistol in his hand to enforce his intent to leave the scene without [the officer]'s permission, either by frightening the officer into doing nothing about it or actually by shooting him." *Id.* at 6.

For essentially the same reasons, we also upheld the conviction under an attempted-battery theory. We stated:

A reasonable jury could infer that [the defendant] was in the process of committing an actual battery when, with his gaze fixed on [the officer who had pulled him over]: [the defendant] started the car and put it in gear in one continuous motion with his right hand; reached straight down his leg to the floor; retrieved a pistol from under the seat and brought it back up in his hand; and leaned to his right while raising the pistol up as far as his knee. The jury could also infer that had it not been for [the second officer]'s intervention by yelling, "Stop!" and shooting at [the defendant], [the defendant] intended to commit a battery by shooting [the first officer].

*Id.* at 7. We relied upon these reasonable inferences from the evidence in affirming the conviction, implying that factual findings of this nature are required whenever intent is at issue in an assault prosecution.

We went further in *(Antwan) Williams,* 887 A.2d 1000. In that case, a suspect in a domestic violence incident was arrested and taken to a police stationhouse for booking. While he was there, a police officer instructed the suspect to take off his shoes and remove their laces. The intoxicated and visibly angry suspect began to comply, taking off his shoes and pulling out one shoelace. When he was directed to remove the second shoelace, he became confrontational; instead of removing the second shoelace, he picked up his other shoe and threw it, hitting the officer in the face. He was subsequently charged with assault and tried in a bench trial. *Id.* at 1001.

At trial, the officer who was hit with the shoe testified that he did not think it had been an accident. However, another officer who also had been present at the stationhouse during the incident, testified that he thought the impact had not been intentional. The defendant also maintained that he had not intended to hit the officer. *Id.* The trial court nevertheless found the defendant guilty, stating:

[Simple assault] is a general intent crime, not a specific intent. [The defendant] didn't have to have a specific intent to injure [the complaining witness] but he had the intent to throw an object that injured the complaining witness. And it was not accidental that he threw the object. He admitted himself [that] he threw the object. That was not any accident. Now, it may have—so the government is correct in that they do not have to prove that there was a specific intent to injure the complaining witness.

*Id.* at 1002. The defendant appealed his conviction, arguing that the government was in fact required to show that he had intended to hit the police officer with his shoe. *Id.* at 1000.

We agreed. Citing *Patterson,* we stated that "[d]ecisions in this jurisdiction have ... reiterated for ninety years or more that in an 'attempted-battery' assault case, the prosecution must prove, *inter alia,* 'an intention ... of using actual violence against the person.'" *Id.* at 1003 (quoting *Patterson,* 43 App.D.C. at 506–07); *see also Alfaro v. United States,* 859 A.2d 149, 156 (D.C.2004) ("The essence of the common law offense of assault is the intentional infliction of bodily injury or the creation of fear thereof."); *Robinson,* 506 A.2d at 575 (sustaining conviction for intent-to-frighten assault where jury was able to "infer[ ] from the pointing of a gun" that defendant had "[a]n intent to frighten"); *Davis,* 712 A.2d at 485 n. 5 (D.C.1998) (attempted-battery assault "requires proof of an intent to cause actual physical injury").

Acknowledging that we had long characterized simple assault as "general intent" crime, we also stated that:

> If this proposition were to be read as broadly as the trial judge applied it in this case, however, this would permit the government to prevail in an assault case without proving what we have identified as the essence of the offense. *Alfaro,* 859 A.2d at 156. In other words, the limitation (no *specific* intent to injure required) would swallow up the rule (government must prove intent to use actual violence).

887 A.2d at 1003. We also observed that the trial court's reasoning would allow the government to prosecute an individual for assault even if no culpability whatsoever attached to her actions:

> In the present case, the trial judge held that if [the defendant] intentionally threw the shoe, then he acted with the requisite general intent. Under the judge's stated view, [the defendant] would be guilty even if he was aiming at the floor, or the wall, or the waste paper basket (or, as she put it, "tossed it to the side"), and accidentally struck the complainant. So long as the throwing was intentional, according to the judge, then it made no difference whether [the defendant] meant to throw it at the complaining witness. The judge thus reasoned that even if one credited the testimony of [the second officer] and of [the defendant] that [the defendant] did not intend the shoe to strike [the officer], [the defendant] was nevertheless guilty of assault. We cannot agree with this position. On the contrary, if the defense version were true, then [the defendant] did not have the intention to use violence against [the officer], and the very essence of attempted-battery assault was lacking.

*Id.* at 1003–04 (citing *Alfaro,* 859 A.2d at 156; *Robinson,* 506 A.2d at 574; *Patterson,* 43 App.D.C. at 506–07; *McGee v. United States,* 533 A.2d 1268, 1269–70 (D.C.1987)). Because the trial court had "articulated and applied an erroneous legal standard," *id.* at 1000, we remanded the case for a factual finding on whether the defendant had intended to hit the officer when he threw the shoe. *Id.* at 1004.

## C.

What is clear from our opinions is that despite our description of assault as a general intent crime, where evidence of the defendant's intent to inflict injury was close, we have in practice required more than the mere "intent to perform the acts which constitute the assault." *Dunn,* 976 A.2d at 219–20. There is no opportunity better than the present to reiterate the dubious value of rote incantations of the traditional labels of "general" and "specif-

ic" intent to the different *mens rea* elements of a wide array of criminal offenses. *See, e.g., Comber v. United States*, 584 A.2d 26, 43 n. 21 (D.C.1990) (en banc) ("Because of the confusion generated in this context by the term 'general intent,' trial judges should avoid its use in voluntary manslaughter jury instructions"). It has been observed that:

> "General intent" is often distinguished from "specific intent," although the distinction being drawn by the use of these two terms often varies. Sometimes "general intent" is used in the same way as 'criminal intent' to mean the general notion of *mens rea*, while "specific intent" is taken to mean the mental state required for a particular crime. Or, "general intent" may be used to encompass all forms of the mental state requirement, while "specific intent" is limited to the one mental state of intent. Another possibility is that "general intent" will be used to characterize an intent to do something on an undetermined occasion, and "specific intent" to denote an intent to do that thing at a particular time and place.

W. LaFave, Substantive Criminal Law § 5.2(e), pp. 353–54 (2d ed. 2003) (footnotes omitted) (hereinafter "W. LaFave"). The Supreme Court also has noted that "[t]his ambiguity has led to a movement away from the traditional dichotomy of intent and toward an alternative analysis of *mens rea*," *United States v. Bailey*, 444 U.S. 394, 403, 100 S.Ct. 624, 62 L.Ed.2d 575 (1980) (citing W. LaFave & A. Scott, Handbook on Criminal Law § 28, pp. 201–202 (1972)), that is based upon the Model Penal Code's division of culpable mental states into "purpose" and "knowledge." *See id.;* W. LaFave § 5.3(b), pp. 342–48; Model Penal Code § 5.01(1).[6]

We need to move away from a distinction that has created confusion in the definition of simple assault under D.C.Code § 22–404(a)(1). A division of the court may not overrule any case by which we are bound if it has relied for its holding upon the distinction between general and specific intent. *See M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C.1971). However, an exhaustive review of our jurisprudence reveals no case in which have we explicitly rejected the argument that appellant makes in this appeal, and where the factual outcome actually hinged on that legal issue. *See Umana v. Swidler & Berlin, Chartered*, 669 A.2d 717, 719 (D.C.1995) ("In determining the scope of our prior holdings, it is important that we examine the contexts in which they were made. 'It is well to remember that significance is given to broad and general statements of law only by comparing the facts from which they arise with those facts to which they supposedly apply.'" (quoting *Kraft v. Kraft*, 155 A.2d 910, 913 (D.C.1959))). In other words, our statements appear to be no more than particularly well-entrenched dicta, and we are not bound by them.[7] *See id.* at 720 &

---

**6.** Model Penal Code § 5.01(1) provides:

> A person is guilty of an attempt to commit a crime if, acting with the kind of culpability otherwise required for commission of the crime, he: (a) purposely engages in conduct that would constitute the crime if the attendant circumstances were as he believes them to be; or (b) when causing a particular result is an element of the crime, does or omits to do anything with the purpose of causing or with the belief that it will cause such result without further conduct on his part; or (c) purposely does or omits to do anything that, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime.

**7.** It is worth repeating the somewhat dubious provenance of the pronouncements that the mere intent to physically perform the assaultive act is sufficient. As discussed in Section A, *supra*, they depend on what is arguably an over-extension of our predecessor court's

n. 8 ("If a court in reaching a decision has not considered a particular point, then the connection of the decision with that point is not a connection of effect and cause, but is purely accidental, and as to that point the decision is no authority whatever. In short, a rule of law should be the product of deliberation, not mere chance." (internal quotations, citations omitted)).

My conclusion from our long line of cases is that our holdings in *(Antwan) Williams, Parks,* and *Robinson* meant what they said and that "[a]ttempted-battery assault requires proof of an attempt to cause a physical injury, which 'may consist of any act tending to such corporal injury, accompanied with such circumstances as denote at the time *an intention,* coupled with the present ability, *of using actual violence against the person.*'" *Robinson,* 506 A.2d at 574 (emphasis added) (quoting *Patterson,* 43 App.D.C. at 506–07). Likewise, "[i]ntent-to-frighten assault ... requires proof that the defendant *intended either to cause injury or to create apprehension in the victim* by engaging in some threatening conduct." *Id.* (emphasis added). As we stated in *(Antwan) Williams,* taking a contrary position would allow the prosecution of individuals for criminal assault for actions taken with a complete lack of culpability.[8]

For attempted-battery assault, the requirement of an assaultive intention is also consistent with the premise that attempted battery, as an inchoate crime, requires an intent to commit the crime being attempted. *See* W. LaFave § 16.3(a), p. 566 ("An attempt to commit any crime requires a specific intent to commit that crime; and so assault of the attempted-battery sort requires an intent to commit the battery, i.e., an intent to cause physical injury to the victim."); Charles E. Torcia, Wharton's Criminal Law § 179, 418 (15th ed. 1994) ("An assault is an attempt to commit a battery. Since, conceptually, a battery is involved, there must be an attempt to commit the target offense. Therefore, the defendant must intend to cause a contact to

---

opinion in *Parker,* 359 F.2d 1009, an ADW case that addressed the defense of voluntary intoxication. The requirements for simple assault are not to be confused, moreover, with those concerning the additional element of use of a dangerous weapon required for ADW, with respect to which we *have* rejected an argument like appellant makes here. *See id.* at 1011–12; *accord, Williamson,* 445 A.2d at 978–79. *Parker* and *Williamson* establish that the use of dangerous weapons carries an inherent risk of serious bodily harm and, therefore, there is no need to show intent beyond what is necessary to establish simple assault to prove the more serious ADW offense. In cases where a dangerous weapon is used, there is an implicit inference of intent or threat to injure. Simple assault is also to be contrasted with APO, the statute for which "proscribes conduct beyond assault, and extends to the actions of anyone who 'assaults, resists, opposes, impedes, intimidates, or interferes with' a police officer." *In re J.S.,* 19 A.3d 328, 331 (D.C.2011) (quoting D.C.Code § 22–405(b)). This broader prohibition reflects a concern over "the likelihood of violence during police encounters." *Id.* at 332 n. 3 (quoting *Coghill v. United States,* 982 A.2d 802, 806 (D.C.2009)). We sustained a conviction for APO in *J.S.* on the theory that he had "resisted" arrest—not assaulted the officer—where the defendant had merely "struggle[ed] to resist [police officers by] holding his arms and did so by moving back and forth, rolling his body from side to side, and twice breaking free from one officer's grip by swinging his arm forward." *Id.*

8. Appellant, in his reply brief, provides a persuasive example:

[A]cceptance of the government's argument would lead to what are certainly unintended results. Take, for example, the case of person A, who stops suddenly while walking on a sidewalk. Person B, walking closely behind, bumps into A and falls down onto the hard pavement. A intended to stop on the sidewalk, but he did not intend to injure B. Could A be guilty of misdemeanor assault? Under the government's theory, the answer is "yes." (Br. for App. at 5).

the person of another[.]"). The same logic applies to *intent*-to-frighten assault as well. *See* W. LaFave § 16.3(b), p. 568 ("[For intent-to-frighten assault,] [t]here must be an actual intention to cause apprehension, unless there exists the morally worse intention to cause bodily harm."); Wharton's Criminal Law § 180, 420 ("Usually, under [the intent-to-frighten] theory of assault, the defendant intends ... to frighten the victim[.]").

It is also worth noting that, under the common law of Maryland, from which the common law of the District of Columbia is derived, "[b]oth varieties of assault are specific intent crimes," *Lamb v. State*, 93 Md.App. 422, 613 A.2d 402, 412 (1992), such that "[a]n assault of the attempted battery variety requires a specific intent to perpetrate a battery," *id.*, and "[a]n assault of the intentional frightening variety ... requires a specific intent to place the victim in reasonable apprehension of an imminent battery," *id.* at 413. Likewise, in neighboring Virginia, "a common law assault, whether a crime or tort, occurs when an assailant engages in an overt act *intended to inflict bodily harm* and has the present ability to inflict such harm or engages in an overt act *intended to place the victim in fear or apprehension of bodily harm* and creates such reasonable fear or apprehension in the victim." *Carter v.*

*Commonwealth*, 269 Va. 44, 606 S.E.2d 839, 841 (2005) (emphasis altered).

### D.

It bears repeating that because attempted-battery assault, by definition, is an *attempt*, there need be no actual injury or contact at all. Therefore, although some cases seem to dwell on evidence of touching "however small," *Ray*, 575 A.2d at 1198 (quoting *Harris v. United States*, 201 A.2d 532, 534 (D.C.1964)), neither injury nor even actual physical touching is an element of assault.[9] Rather, the fact and nature of physical contact or injury may provide *sufficient evidence of the intent* to injure the person either by physical force or by touching in an offensive manner.

It is also worth noting that although our cases state that attempted-battery assault requires an intent to cause bodily injury by making an attempt to batter with "force or violence," those terms do not necessarily import their everyday meaning when used in this context. Many assault cases do involve violent actions and actual physical injury, but nonviolent acts that are *offensive in nature* and involve no physical injury also can be assaultive in character. This is because simple assault "is designed to protect not only against physical injury, but against all forms of offensive touching, and even the mere threat of such touch-

---

9. A few examples illustrate the point. If A points a gun at B, but does not fire, or points an inoperative gun at B, A commits intent-to-frighten assault, but not attempted-battery assault, because the evidence supports that A had an intent to frighten B, but not an intent to cause bodily injury. *Compare Robinson*, 506 A.2d at 574–75, *with McGee*, 533 A.2d at 1270–71. If A shoots the gun at B, but misses, A commits attempted-battery assault (as well as assault with a dangerous weapon) because the act of shooting the gun supports his intent to cause bodily injury and A had the present ability to cause injury, even if no injury (or touching) resulted in fact. *See Join-*

er v. United States, 585 A.2d 176, 178 (D.C. 1991). If A intentionally fires the gun aiming away from B to "scare" B, A commits intent-to-frighten assault, but not attempted-battery assault, because the deliberate aiming away from B does not support that A intended to cause B any bodily injury. *See State v. Baker*, 20 R.I. 275, 38 A. 653, 654 (1897). In none of these cases—all assaults—did a bullet touch B. Of course, if the bullet actually hits B (other than by unforeseen accident), A might be guilty not only of assault, but also of a higher offense that requires actual physical injury, such as aggravated assault.

ing." *Comber v. United States*, 584 A.2d 26, 50 (D.C.1990) (en banc). Thus, unwanted sexual contact, see note 4, *supra;* spitting on a person, *Ray*, 575 A.2d at 1199; and jostling or touching in the course of a theft from the person, *see Harris*, 201 A.2d at 534; *Mahoney v. United States*, 243 A.2d 684, 685 (D.C. 1968), have been found sufficient to constitute assault. The actor's intent to offend against the person is evident in all these situations.

Where an act is violent or clearly offensive in nature, evidence of the act itself will suffice to infer the necessary assaultive intent. In other cases, however, the actor's assaultive intent is to be inferred from the circumstances, such as threats or slurs that may accompany the act, as well as from the physicality and forcefulness of the conduct itself. A recent case offers an illustrative example. In *Dunn*, a security officer was confronted by an animal-rights protester who had concealed his face, taunted the officer with a chant ("all your fault, all your fault"), "shoved" a protest sign at the officer, and "thrust[ing] forward," "pushed" with enough force to cause the 6'4", 215 pound security officer to move back. 976 A.2d at 218–19. The officer was not hurt. Relying on cases explaining that assault protects against "offensive touching," the court concluded that the evidence was sufficient to prove assault, where a security officer "was offended when a masked stranger chanted at and then pushed him without provocation." *Id.* at 222. In *Dunn*, the degree of physical force used, as well as the accusatory chanting by an unknown, masked person, sufficed to establish the actor's intent to inflict offensive bodily contact on the security officer. The facts in *Dunn* are to be distinguished from other situations where people regularly come into "unwanted" physical contact in their daily lives, *e.g.,* where a person steps on another's foot while straining to watch a parade or on the dance floor; where a Metro rider elbows another passenger in her haste to board a crowded train; or where an exuberant physically demonstrative person bear-hugs a more reserved individual, or double (or triple) kisses another upon a social encounter in accord with the cultural custom of one, but not the other. *Cf.* 4 STEPHEN'S COMMENTARIES ON THE LAWS OF ENGLAND 62–63 (L. Crispin Warmington ed., 21st ed. 1950) (noting that for the tort of battery, "the slightest degree of force is sufficient, provided that it be applied in a hostile manner, as by pushing a man or spitting in his face. Touching a man to attract his attention to some particular matter, or a friendly slap on the back is not battery, owing to the lack of hostile intention."). Not every unwanted or unwelcome physical contact rises to the level of a criminal offense. Even though many such actions may offend standards of courtesy and disappoint mothers who taught good manners, they are not criminal assaultive acts because they are not accompanied by the requisite assaultive intent.

### III.

This brings us to facts of the case at hand. The trial court denied appellant's motions for judgment of acquittal after hearing the government's argument that appellant need only have intended the act that constituted the assault, and the defense's argument that there needs to be a further showing of intent to injure the officer, relying on *Williams*. In stating its relatively brief findings of fact and conclusions of law, the trial court did not expressly parse the two separable issues of intent to do the act, and intent to inflict injury on Lieutenant Wilkins. According to the trial judge, "[t]he defendant was flailing his elbows around trying to keep them apart so he wouldn't be cuffed. Now that's the occasion for the assault on Lieutenant Wilkins." As our *per curiam* opin-

ion states, it is difficult to glean from this statement and all that preceded it whether the court adopted the government's minimalist interpretation and found appellant guilty of simple assault because he intended the action, *i.e.,* moved his arms and kept his elbows apart to avoid being handcuffed, or whether the court implicitly found that appellant intended to injure or use force against Lieutenant Wilkins by striking him with his elbows in order to accomplish that objective. In light of this ambiguity, we are remanding the case for further proceedings consistent with this opinion.[10]

As in *(Antwan) Williams,* the fact that appellant engaged in an act that resulted in contact with the officer is a given. What makes this case potentially more difficult to resolve is that here Lieutenant Wilkins and appellant were in very close proximity, literally touching each other, because the officer was attempting to grab appellant's arms to handcuff him, such that *any* movement or action by appellant was virtually guaranteed to cause physical contact with the officer. On remand, the trial court must determine whether appellant, in these circumstances, had " 'an intention, coupled with the present ability, of using actual violence against' Lieutenant Wilkins," *Robinson,* 506 A.2d at 574 (quoting *Patterson,* 43 App.D.C. at 506–07), or "to cause injury," *id.; see also Williams,* 887 A.2d at 1004, as these terms are understood in the context of assault. In doing

so, the court may take "a more comprehensive view of the evidence." *Howard v. United States,* 966 A.2d 854, 857 (D.C. 2009); *see Foster v. United States,* 699 A.2d 1113, 1116–17 n. 5 (D.C.1997).

---

10. I cannot conclude, based on the cold record, that the government's evidence is insufficient to convict under the proper legal standard. As pointed out in the text, there is the factual question whether appellant purposely elbowed the officer or hit him in the process of keeping his arms from being handcuffed. Moreover, Lieutenant Wilkins testified that he and appellant "tussl[ed]" and "wrestl[ed]." The trial judge did not rely on this testimony. Though appellant argues that the officer's use of these terms, when viewed in context, cannot be understood to have their usual mean-

ing, it is for the trial judge to evaluate the import of the testimony he heard first-hand in applying correct legal principles to "a more comprehensive view of the evidence." *Howard,* 966 A.2d at 857 (APO); *see also Foster,* 699 A.2d at 1116–17 n. 5 ("In a bench trial, . . . the trial court will often reveal the precise basis for the decision. . . . If that particular basis is erroneous but other bases not addressed by the trial court would sustain a conviction, the proper course of action is to remand rather than reverse outright.").